# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA ex rel. )
DANIEL GARCIA, )
          )
        Petitioner, )      No. 11 C 1973
          )
      v. )      Judge James B. Zagel
          )
RANDY PFISTER, Acting Warden, Pontiac )
Correctional Center, )
          )
        Respondent. )

## ¹EMORANDUM OPINION AND ORDER

Petitioner Daniel Garcia ("Garcia" or "Petitioner") is incarcerated at the Pontiac
Correctional Center in Pontiac, Illinois and is identified as prisoner number K53187. On January
9, 1997, a jury in the Circuit Court of Cook County, Illinois found Petitioner guilty of first-
degree murder, aggravated kidnapping, and robbery. Petitioner was sentenced to concurrent
prison terms of eighty years for first-degree murder, fifteen years for aggravated kidnapping, and
seven years for robbery. Garcia now petitions for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254. For the following reasons the petition for a writ of habeas corpus is DENIED.

## I. BACKGROUND

### A. Facts

The facts as determined by the state court are presumed to be correct in the absence of
clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Daniels v. Knight,* 476
F.3d 426, 434 (7th Cir.2007). Petitioner has disclaimed any argument under § 2254(e)(1). I

---

[1] Randy Pfister was the acting warden of Pontiac Correctional Center, where Petitioner is incarcerated, and was
substituted as the proper respondent in this matter at the time respondent provided its answer to Petitioner's habeas
petition. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts; Fed. R. Civ.
P. 25(d); *Rumsfeld v. Padilla,* 542 U.S. 426, 434-35 (2004) (citing *Hogan v. Hanks,* 97 F.3d 189, 190 (7th Cir.
1996)); *Bridges v. Chambers,* 425 F.3d 1048, 1049-50 (7th Cir. 2005).

therefore largely adopt the background facts and procedural history as laid out by the Illinois

Appellate Court, First District; *see United States ex rel. Hemphill v. Hardy,* 2011 U.S. Dist.

LEXIS 75519, 2011 WL 2712592 (N.D. Ill. Jul. 13, 2011):

> The record reveals the following facts. On February 9, 1992, at approximately 11:40 a.m., police found the body of 78-year old Margaret Anderson under a viaduct abutting the west sidewalk of the 3000 block of North Sacramento and the Kennedy expressway, in Chicago Illinois. Anderson was naked from the waist down, and police found no purse or identification near her body. [Petitioner] and co-defendant [Benjamin Kirk] were arrested on February 14, 1992. The trial court granted Kirk's motion to sever his case from that of [petitioner's], and [petitioner] and Kirk were tried before separate juries. This appeal pertains only to petitioner's trial.

> After a pre-trial hearing, the trial court denied [petitioner's] motion to quash arrest and suppress evidence, and to present evidence of alleged police misconduct in other cases at trial. [Petitioner] also filed a motion to suppress statements in which he alleged that his handwritten statement was the product of physical coercion, but [petitioner] later withdrew this motion.

> At trial, Bolivar Lopez testified he worked installing medical equipment in nursing homes. On Saturday, February 8, 1992, he returned the company vehicle to a suburban office, and returned to Chicago via public transportation. At approximately 11:30 a.m., Lopez got off of a bus at Belmont and Sacramento and walked his usual route home. As he reached Sacramento Boulevard under the Kennedy Expressway overpass, he looked up to note the presence of pigeons, because "sometimes they get messy," and noticed what appeared to be a human hand on the ledge under the viaduct. Lopez climbed the incline and discovered Anderson's body. Lopez stated that Anderson's face was "bashed and bloody," and that she was undressed from the waist down. Lopez further stated that there was a lot of blood around the body. Lopez went immediately to his sister's house located approximately 200 to 300 feet away and called the police. Lopez then returned to the scene with police. At trial, Lopez identified photographs of the area where he discovered Anderson's body.

> Several Chicago Police Officers testified as to their observations at the scene. Officer Dusan Puhar stated that Sacramento is a two-lane street running north and south under the Kennedy Expressway. There are sidewalks on both sides of the street. On

the west side of the street there is a steep incline, and a ledge at the top. Anderson was lying on her back on that ledge, approximately 30 to 40 feet above the sidewalk, her slacks and underwear pulled down around one of her legs. The officers who viewed Anderson's body at the scene were unable to determine her race or age because of the condition of her face, and she was initially listed as "Jane Doe" in the police reports. The officers noted that it was a "brutally cold February day."

Photographs taken by Chicago Police Officer James Hogan revealed that Anderson was dressed in winter clothing except that "her lower clothing was all down and wrapped around her ankle." Officer Hogan inventoried property recovered at the scene including a set of keys, and clothing later determined to belong to a homeless man living under the viaduct. Police subsequently determined that the keys opened the doors at 2912 North Whipple, Anderson's address. Mary Wentland, Anderson's niece[,] confirmed Anderson's identity when she identified the body at the officer of the Cook County Medical Examiner. Wentland testified that Anderson wore eyeglasses.

* * *

Assistant Chief Medical Examiner Mitra Kalelkar testified regarding the autopsy performed by Dr. Debra Kay. Dr. Kay's report revealed that Anderson had multiple injuries on her head and face including various abrasions, bruises around both eyes, a fractured nose, and lip lacerations. Anderson also had bruises and abrasions on her knees and "drag marks" on her right thigh. The pathologists found evidence of hemorrhages to the brain and determined that Anderson's neck was broken. At the time of her death, Anderson was a well-developed, well-nourished elderly lady who weighed 105 pounds and stood five-feet-one inch tall.

Dr. Kalelkar agreed with Dr. Kay that Anderson died from multiple injuries sustained as a result of blunt trauma, consistent with being struck in the face and with her head being struck against a concrete ledge. Dr. Kalelkar opined that Anderson's head was hit against the concrete so hard that her neck broke.

Police Officers Cruz Reyes and Nathaniel Hill testified that on February 13, 1992, they were working in plain clothes in an unmarked Chevy. Reyes and Hill began a systematic canvass of the area surrounding Anderson's murder to investigate their "sources." In Logan Square outside of Johnnie's Grill, the officers interviewed Rosie Cintron, a prostitute and drug user with whom they had spoken on prior occasions. Officer Reyes testified that drug addicts, drug dealers, and prostitutes frequent Johnnie's Grill.

The officers stated that Cintron reacted as if taken aback when the officers asked her if she had any information about a murder involving an elderly woman at Sacramento underneath the Kennedy Expressway. Cintron agreed to accompany the officers in their squad car to the parking lot of a muffler shop to discuss the murder. Afterward, Officer Reyes called Officer Anthony Wojcik from a pay phone, and drove Cintron to Grand and Central. The officers later turned the investigation over to Detectives William Dorsch and Richard Schak.

Rosie Cintron testified that she lived in Chicago in February 1992, and that she knew [Petitioner] and codefendant. At that time, Cintron was a serious drug user, and she supported herself by working as a prostitute and by selling drugs. She was also receiving public aid, and was twice convicted for possession of a controlled substance.

On February 7, 1992, Cintron got high with [Petitioner] and co-defendant at a crack house on Albany. She was high all that day and into the night. In the early morning hours, Cintron and [Petitioner] left the crack house in a cab. They had no drugs left at that time. When it was almost daylight, [Petitioner] told Cintron to get out of the cab because "they were going to score."

Later that morning, Cintron saw [Petitioner] and codefendant running into the crack house. Their clothes were "messed up." When they emerged from the crack house, [Petitioner] had some "rocks" of crack cocaine and a gold bracelet. [Petitioner] said he had to sell the bracelet.

A few days later, Cintron saw [Petitioner] at a hotel located at Fullerton and Pulaski late at night. [Petitioner] told Cintron that he and co-defendant were watching an old lady from their position on a viaduct, and that codefendant grabbed her as she was walking by and started beating up on her. [Petitioner] said that co-defendant was "nothing but an animal," and that "he was brutal." [Petitioner] stated that the lady was wearing glasses, and that co-defendant took the glasses and threw them on the expressway. They took her gold bracelet, the same one [Petitioner] had previously shown to Cintron.

Cintron stated that she voluntarily told this story to the police, and that she identified [Petitioner] and codefendant from police photographs. Cintron stated that she later testified before a grand jury. Cintron admitted that she was not completely forthright in her testimony to the grand jury. Cintron also admitted that she used

numerous aliases and that she was on mandatory supervised release [from] prison at the time of trial.

Carmen Rivera testified pursuant to an arrest warrant that in February 1992, she was living at 2852 North Albany in a first floor apartment with co-defendant. Rivera and co-defendant had been asked to vacate the apartment. At that time, Rivera was a cocaine addict, using about $100 of cocaine a day. On February 7, 1992, Rivera and co-defendant smoked cocaine, and Rivera went to sleep at approximately 2 or 3 a.m., after telling codefendant to wake her at 9 a.m. Co-defendant left the apartment without keys. At that time, co-defendant had no more cocaine, and had no money to buy cocaine.

Rivera next saw co-defendant at 1 p.m. that afternoon. Co-defendant was wearing the same clothes as the night before, his face was swollen and his hands were "kind of" scratched up. Rivera and co-defendant engaged in a quarrel, and Rivera left the apartment, returning later that evening. Upon her return, co-defendant had some cocaine and was preparing it on the stove for smoking. Rivera looked at the floor, because while cocaine is being prepared, it sometimes "pops off" the plate. On the floor, Rivera found a small bracelet bearing a blank I.D. tag. Rivera asked co-defendant if it was real, and he told her that it was, but said she could not keep it because it was "hot." Rivera and co-defendant decided to sell the bracelet for cocaine. Then they smoked all of the cocaine they had.

On Sunday, February 9, 1992, at approximately 1 or 2 a.m., Rivera went to the home of Nancy Kuntu-Nelson at 2415 North Albany. Rivera and Kuntu-Nelson went to Johnnie's Grill to meet with co-defendant.

Later that day, Rivera noticed some things in her apartment, including a lady's clear plastic purse and an empty brown glasses case that had not been there on February 7th. Rivera was moving out of the apartment that day, and checked the whole apartment to make sure she left nothing behind. However, when she attempted to check under the stove for hidden drugs, co-defendant stopped her. Rivera took the clear purse with her when she left the apartment. Rivera later gave the purse to the police.

Kuntu-Nelson, a cocaine user who sold cocaine out of her apartment, testified that co-defendant approached her in her car at Johnnie's Grill, and she agreed to purchase the bracelet. Kuntu-Nelson stated that she thought she saw [Petitioner] standing

outside Johnnie's Grill, but was not sure. Co-defendant got into Kuntu-Nelson's car, and she gave him a sixteenth of cocaine and twenty dollars for the bracelet. When Kuntu-Nelson originally spoke with police, she did not mention that [Petitioner] was present for the bracelet transaction. On February 10, 1992, Kuntu-Nelson sold the bracelet to Tania's Jewelry Box on Milwaukee for thirty dollars.

Miguel Sanchez, president of Tania's, testified that his store purchased a gold bracelet from Kuntu-Nelson and melted it down prior to speaking with police on February 15, 1992.

Jacquelyn Kagan testified that she was the owner of the apartment at 2852 North Albany in which Rivera lived with her family and co-defendant in February 1992. While cleaning the apartment after the Riveras, et al., vacated it, Kagan discarded numerous items including an eyeglasses case, clothing and drug paraphernalia. Kagan further discovered some things jammed underneath the stove, and called Chicago Police Detective Anthony Wojcik.

Detective Wojcik testified that he referred Kagan to Detective Dorsch. Detective Dorsch met Kagan at her building, and found a black plastic case underneath the stove, containing identification bearing Anderson's name.

Police arrested [Petitioner] at 2429 North Albany on February 14, 1992. Assistant State[']s Attorney (ASA) Theodore Kmiec advised [Petitioner] of his *Miranda* rights, and [Petitioner] agreed to make a statement. ASA Kmiec later trascribed the statement, and read it aloud to [Petitioner]. [Petitioner] made corrections, [initialed] changes and signed the statement.

[Petitioner's] written statement was admitted into evidence and published to the jury. In his statement, [Petitioner] said that on February 8, 1992, at approximately 5 a.m., he and co-defendant were standing in front of Johnnie's Grill. They decided to "go out and make some money," which meant steal things. As they were walking on Diversey Avenue, they decided to steal the radio and stereo out of a Mazda automobile. Codefendant acted as the lookout while [Petitioner] stole the car stereo.

[Petitioner] and co-defendant continued walking on Diversey toward Sacramento. They turned northbound on Sacramento, and saw an old lady with glasses walking down the street. They noticed some jewelry on the woman and decided that it was gold. Co-defendant suggested they steal the woman's purse and [Petitioner]

agreed. Co-defendant ran up in front of the woman and attempted to grab her purse while [Petitioner] stood behind her. When the woman resisted co-defendant, he punched her in the face. Co-defendant told the woman to give him her jewelry, but she refused and asked him why, so he hit her. Co-defendant then hit the woman in the face again. [Petitioner] told her to give up her jewelry and she would not get hit anymore.

[Petitioner] told co-defendant to get the bracelet and stop hitting the woman, but co-defendant told him to shut up and "keep watching out." Co-defendant then grabbed the woman by the hair and dragged her up and under the viaduct. [Petitioner] got scared and ran back to Johnnie's Grill because there were cars driving around in the area.

Approximately one hour later, co-defendant returned to Johnnie's Grill and motioned for [Petitioner] to come outside. When co-defendant shook [Petitioner's] hand, [Petitioner] found a gold bracelet inside. It was the bracelet the lady had been wearing. Co-defendant gave [Petitioner] the bracelet and said, "you did not see anything."

[Petitioner's] signed statement provided that he told police the truth, and that he was well treated by the police, that he received food, drinks and cigarettes, and was allowed to use the bathroom.

The parties stipulated to the testimony of John Waitman, a latent fingerprint examiner for the Chicago Police Department, and Pamela Fish, a serologist and microbiologist formerly with the Chicago Police Department. Waitman would have testified that he examined evidence from the scene of the crime, and that he did not find any prints suitable for comparison. Fish would have stated that she found no evidence that Anderson was sexually assaulted, but did determine that a vial of reddish-brown substance taken from the sidewalk at 3030 North Sacramento contained human blood. Another vial taken from the ledge under the viaduct at that location also contained human blood.

[Petitioner] testified on his own behalf that in February 1992, he smoked marijuana and rock cocaine. He was unemployed, and when he wanted to get high, he would break into cars and steal things.

After his arrest on February 13, 1992, [Petitioner] stated that he was left alone in a room at the 14th District police station, handcuffed to a wall. Detective Dorsch threw [Petitioner's] hat on

the floor and smacked [Petitioner] in the face. Detective Dorsch asked [Petitioner] what he knew about a murder on Sacramento Street. When [Petitioner] denied knowing anything about the murder, Detective Dorsch punched him in the eye, pulled his hair and smacked him in the face again. The detectives then left the room.

[Petitioner] stated that approximately one hour later, Detective Dorsch and his partner returned, showed [Petitioner] a photograph of an elderly couple, and told [Petitioner] that the woman was killed and that they believed co-defendant had something to do with it. When [Petitioner] denied any knowledge of the crime, the detectives told him that they interviewed Cintron, and that she said he knew something. The detectives forced [Petitioner] to stand up and Detective Dorsch him [Petitioner] in the stomach. Detective Dorsch kicked [Petitioner] in the ribs when he refused to stand up again.

[Petitioner] further testified that Officer Wojcik came into the interview room and put some keys and an I.D. card in [Petitioner's] jacket. When Petitioner told the officer that he was searched earlier and no one found anything, Officer Wojcik took the keys and I.D. and left.

[Petitioner] stated that later that evening, Detectives Dorsch and Schak took him to another room where they taped over the window in the door and questioned him further. [Petitioner] claimed that when he continued to deny any knowledge of the murder, Detective Schak hit him in the head with a telephone book. [Petitioner] fell and cut his arm on the corner of the table. [Petitioner] stated that Detective Schak told him that every time he denied knowing anything, Detective Schak would him with the telephone book, and that Detective Schak hit [Petitioner] between four and seven times.

[Petitioner] stated that he eventually signed the handwritten statement because he was told it was the only way to stop the beating and because he wanted to go home. Detective Schak told [Petitioner] that the statement would not hurt [Petitioner] and that he would not be arrested. [Petitioner] met with the ASA, but did not read the entire statement prior to signing it, and initialed the statement where he was told to do so. [Petitioner] stated that he told the ASA that the officers beat him and hit him in the face. The ASA never asked [Petitioner] what he knew about Anderson's death.

When [Petitioner] arrived at Cermak Hospital at the Cook County Jail, he met with a paramedic. Although he had a cut on his arm and a bruise under his eye, [Petitioner] did not tell the paramedic about the other injuries or make any other complaints.

On cross-examination, the prosecutor showed [Petitioner] two photographs of himself taken in January 1992, one month prior to the time he was taken into custody for Anderson's murder. [Petitioner] admitted that at a prior hearing, he circled "marks" on those photographs which he claimed showed the injuries he sustained while in custody in February 1992.

[Petitioner] denied any connection to Anderson's robbery and murder, and discounted Cintron's testimony, stating that Cintron was angry with him when he failed to give her money for cocaine.

On rebuttal, Chicago Police Officer Dennis Palaz identified People's exhibits 37 and 38 as photographs of [Petitioner] taken on January 10, 1992, when [Petitioner] was booked on an unrelated crime.

Detectives Dorsch and Schak testified that no officer mistreated [Petitioner] in any way on February 14, 1992, while he was in custody. Detective Dorsch further denied taping paper over a window at the police station, and stated that no one promised [Petitioner] that if he gave a statement, he would not be charged with a crime.

Cook County Jail emergency medical technician Laura Hoefling, stated that she processed [Petitioner] on February 15, 1992, and that [Petitioner] had no bruises on his face. [Petitioner] told Hoefling that he had no cuts or bruises on his arm.

*People v. Garcia,* 301 Ill. App. 3d 1085, 253 Ill. Dec. 889, 746 N.E.2d 337 (1998) (No.

1–97–1049) (unpublished order under Illinois Supreme Court Rule 23).

## B. Procedural History

On January 9, 1997, a jury in the Circuit Court of Cook County, Illinois found Petitioner

guilty of first-degree murder, aggravated kidnapping, and robbery. *Id.* Petitioner was sentenced

to concurrent prison terms of eighty years for first-degree murder, fifteen years for aggravated

kidnapping, and seven years for robbery. *Id.* Petitioner directly appealed to the Illinois Appellate

Court, and his counsel asserted three claims:

(1) Petitioner was deprived of a fair trial by the admission of highly inflammatory testimony suggesting the victim was sexually assaulted;
(2) the State failed to prove him guilty of aggravated kidnapping because it had not proved the elements of secret confinement or detention; and
(3) the eighty-year sentence was an abuse of discretion.

Brief and Argument for Defendant-Appellant at i-iii, People v. Garcia, 301 Ill. App. 3d 1085, 253 Ill. Dec. 889, 746 N.E.2d 337 (1998) (No. 1–97–1049) (unpublished order under Illinois Supreme Court Rule 23). Petitioner also filed a *pro se* supplemental brief, which the appellate court allowed, raising six claims:

(1) trial counsel was ineffective for: failing to impeach a key witness (Cintron) who admitted to false testimony; failing to seek dismissal of the indictment because of perjured testimony; introducing a theory that Cintron was a paid state informant, but failing to pursue evidence to support the claim; failing to obtain photographs that demonstrated petitioner was beaten by police and forced into confessing; conceding guilt and failing to call witnesses, investigate, and subpoena records; and failing to seek suppression of the confession;
(2) the State violated petitioner's due process rights by knowingly using perjured testimony;
(3) the State engaged in selective prosecution based on the age, race, and gender of the victim;
(4) the trial court abused its discretion by allowing the State to switch petitioner's county jail intake photographs with those from a different arrest;
(5) the trial court abused its discretion by not dismissing the indictment when key witnesses admitted to perjury; and
(6) the trial court abused its discretion by not impeaching a witness who admitted perjury.

Pro Se Supplemental Brief for Defendant-Appellant at i, People v. Garcia, 301 Ill. App. 3d 1085, 253 Ill. Dec. 889, 746 N.E.2d 337 (1998) (No. 1–97–1049) (unpublished order under Illinois Supreme Court Rule 23). On December 11, 1998, the appellate court affirmed the circuit court's conviction. *People v. Garcia,* 301 Ill. App. 3d 1085, 253 Ill. Dec. 889, 746 N.E.2d 337 (1998) (No. 1–97–1049) (unpublished order under Illinois Supreme Court Rule 23). Petitioner conceded that he failed to file a petition for leave to appeal (PLA) in the Illinois Supreme Court following

10

the appellate court's judgment. Petition for Writ of Habeas Corpus – Person in State Custody at 2, Garcia v. Pierce, No. 1:11-cv-01973 (N.D. Ill. April 18, 2011).

On August 24, 1999, Petitioner then filed a *pro se* post-conviction petition pursuant to 725 ILCS 5/122-1, wherein he claimed ineffective assistance of trial counsel in the examination of Rosie Cintron and ineffective assistance of appellate counsel based, in part, on his failure to raise the issue of trial counsel's ineffectiveness. *People v. Garcia,* 939 N.E.2d 972, 979 (Ill. App. 2010). On December 2, 1999, the circuit court judge summarily dismissed Petitioner's petition. *Id.* On March 12, 2001, the Illinois Appellate Court reversed and remanded the case for second stage proceedings on Petitioner's motion because the dismissal occurred beyond the statutory 90-day period for summary dismissals. *Id.* On remand, the public defender was appointed as counsel for Petitioner and filed a supplemental petition for post-conviction relief, adopting Petitioner's initial petition and supplemental amendment, as well as the documents and exhibits appended to the pleadings. *Id.* at 980. On September 25, 2008, the circuit court then granted the State's motion to dismiss and denied an evidentiary hearing. *Id.* Petitioner appealed, raising three claims:

> (1)  an evidentiary hearing was necessary to determine whether: (a) forensic evidence was properly tested; (b) trial counsel was ineffective for stipulating to the results of the forensic testing; and (c) the forensic evidence could prove petitioner's actual innocence;
>
> (2)  appellate counsel was ineffective for failing to argue that Petitioner's rights to effective assistance of counsel and due process were violated when a key witness (Rosie Cintron) admitted her testimony was false; and
>
> (3)  post-conviction counsel did not provide the level of assistance required by Illinois law.

Brief and Argument for Petitioner-Appellant at i-iv, People v. Garcia, 405 Ill. App. 3d 608, 939 N.E.2d 972 (2010). On November 5, 2010, the appellate court affirmed the judgment of the circuit court. *People v. Garcia*, 405 Ill. App. 3d 608, 626, 939 N.E.2d 972, 989 (2010). Petitioner

then filed a PLA, raising two claims:

    (1)  post-conviction counsel did not provide the assistance required by Illinois law; and

    (2)  res judicata should not have barred the claim that trial counsel mishandled Cintron's allegedly false testimony; petitioner raised it only in a pro se supplemental brief on direct appeal because counsel failed to do so properly.

Petition for Leave to Appeal at 1-2, People v. Garcia, 239 Ill. 2d 565, 943 N.E.2d 1104 (2011) (No. 111545). On January 26, 2011 the Illinois Supreme Court denied the PLA. *People v. Garcia*, 239 Ill. 2d 565, 943 N.E.2d 1104 (2011).

    Meanwhile, on March 29, 2001, Garcia filed a separate post-conviction petition, which the circuit court dismissed on April 30, 2001. *People v. Garcia*, 333 Ill. App. 3d 1206, 836 N.E.2d 229 (2002) (No. 1–01–2238) (unpublished order under Illinois Supreme Court Rule 23). Petitioner then appealed the dismissal, and the sole issue on appeal was whether Garcia's eighty-year extended term sentence for murder violated the rule set forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which held that under the due process right of the Fourteenth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact other than prior conviction that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proven beyond a reasonable doubt. *Id.* Garcia argued that his extended-term sentence was unconstitutionally based on a judicial finding that the offenses were accompanied by exceptionally brutal and heinous behavior. *Id.* On September 27, 2001, the appellate court affirmed the circuit court's dismissal of Garcia's petition. *Id.* Petitioner filed a PLA for this claim, which the Supreme Court of Illinois denied on October 7, 2003. *People v. Garcia*, 205 Ill. 2d 606, 803 N.E.2d 489 (2003).

    Finally, on March 22, 2011, Petitioner filed the present petition pursuant to 28 U.S.C. § 2254, raising four claims:

(1) the State violated Petitioner's due process rights by knowingly using perjured testimony of Rosie Cintron, who lied to the grand jury and at trial;

(2) trial counsel was ineffective for failing to elicit testimony from Cintron that she lied to the grand jury and at trial;

(3) direct appeal counsel was ineffective for failing to raise claims (1) and (2) on direct appeal; and

(4) trial counsel was ineffective for stipulating to the forensic evidence, which could have proved petitioner's innocence.

## V. STANDARD OF REVIEW

Two of petitioner's claims are procedurally defaulted, but with respect to the two that are not, under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a habeas petition can only be granted if a state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1–2) (2000).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law; [or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that of the Court. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Express citation or even awareness of the relevant precedent is not required "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002).

A state court's decision constitutes an "unreasonable application" of clearly established federal law if the state court identified the correct legal rule but unreasonably applied the controlling law to the facts of the case. *Williams,* 529 U.S. at 407. "An unreasonable application

of federal law is different from an incorrect application of federal law." *Id.* at 410. Rather, "unreasonable" means that a state court's decision lies "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002). The operative decision under AEDPA is that of the last state court to address any claim on the merits. *Garth v. Davis,* 470 F.3d 702, 710 (7th Cir. 2006). Here, that case is the Illinois Appellate Court, First District's decision in *People v. Garcia,* 939 N.E.2d 972 (Ill. App. Ct. 2010).

## VI. ANALYSIS

**CLAIM 1—the State violated Petitioner's due process rights by knowingly using perjured testimony of witness Rosie Cintron, who lied to the grand jury and at trial.**

Petitioner's first claim that the State violated his due process rights by knowingly using the allegedly false testimony of Rosie Cintron is procedurally defaulted, so I cannot reach it on the merits. "Inherent in the habeas petitioner's obligation to exhaust his state court remedies before seeking relief in habeas corpus . . . is the duty to fairly present his federal claims to the state courts." *Lewis v. Sternes,* 390 F.3d 1019, 1025 (7th Cir. 2004) (citing *Baldwin v. Reese,* 541 U.S. 27, 124 S.Ct. 1347, 1349 (2004)). "Fair presentment" requires the petitioner to assert his federal claims through "one complete round of state-court review," either on direct appeal or in post-conviction proceedings. *Lewis,* 390 F.3d at 1026 (citing *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 1732-33 (1999)); *see also* 28 U.S.C. § 2254(b)(1). In other words, a petitioner must have presented his claims "at each and every level in the state court system" to give the state courts "a meaningful opportunity to consider the substance of the habeas claims that he later presents in his federal challenge." *Lewis,* 390 F.3d at 1025; *Bintz v. Bertrand,* 403 F.3d 859, 863 (7th Cir. 2005).

In this case, Petitioner raised Claim 1 in his pro se supplemental brief on direct appeal. However, Petitioner failed to file a petition for leave to appeal (PLA) in the Illinois Supreme Court after the Illinois Appellate Court affirmed his conviction. Petition for Writ of Habeas Corpus – Person in State Custody at 2, Garcia v. Pierce, No. 1:11-cv-01973 (N.D. Ill. April 18, 2011). Thus, Claim 1 was not raised through one complete round of Illinois's appellate review process and is procedurally defaulted.

A petitioner may be excused from procedural default only by showing either (1) "both cause for and prejudice stemming from that default" or (2) that the failure to consider the claim will result in a "miscarriage of justice." *Lewis*, 390 F.3d at 1026 (citing *Wainwright v. Sykes*, 433 U.S. 72, 86-87, 97 S.Ct. 2497, 2506 (1977); *Murray v. Carrier*, 477 U.S. 478, 495-96, 106 S.Ct. 2639, 2649 (1986)). First, to demonstrate "cause," the petitioner must show "that some type of external impediment prevented the petitioner from presenting his federal claim to the state courts." *Lewis*, 390 F.3d at 1026 (citing *Murray*, 106 S.Ct. at 2645, 2648). To demonstrate "prejudice," the petitioner must show that "the violation of the petitioner's federal rights worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Lewis*, 390 F.3d at 1026 (emphasis in original) (internal quotation marks omitted) (citing *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596 (1982)).

Alternatively, to show that procedurally barring the habeas petition would result in a "miscarriage of justice," the petitioner must show that he is "actually innocent of the offense for which he was convicted, i.e., that no reasonable juror would have found him guilty of the crime but for the error(s) he attributes to the state court." *Lewis*, 390 F.3d at 1026 (citing *Schlup v. Delo*, 513 U.S. 298, 327-29, 115 S.Ct. 851, 867-68 (1995)). The petitioner asserting "actual innocence" to excuse a procedural default "must *demonstrate* innocence" by presenting "new

reliable evidence that was not presented at trial" and by showing that in light of the new evidence "it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327-28; *Buie v. McAdory*, 341 F.3d 623, 626 (7th Cir. 2003) (emphasis in original). *See also Hayes v. Battaglia,* 403 F.3d 935, 938 (7th Cir. 2005) ("To demonstrate innocence so convincingly that no reasonable juror could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence."). "[T]he burden is [petitioner's], not the state's, for the state has the benefit of the jury's verdict." *Buie v. McAdory*, 341 F.3d at 626-27.

Here, Petitioner did not claim that he satisfied either of the two exceptions to procedural default, so he forfeited any such argument. *See Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008) (holding that because habeas petitioner did not attempt to excuse his default, the court "[could not] consider his claim"). First, while Petitioner claimed that his direct appeal counsel was ineffective for failing to raise this due process issue on direct appeal, and ineffective assistance of counsel may sometimes constitute "cause," a "*constitutional* right to effective assistance must be the predicate to any such claim." *Brown v. Watters*, 599 F.3d 602, 609 (7th Cir. 2010) (emphasis in original); *see also Wainwright v. Torna*, 455 U.S. 586, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982) (holding that where there is no constitutional right to counsel, there can be no deprivation of effective assistance). "[A] criminal does not have a constitutional right to counsel to pursue discretionary state appeals." *Anderson v. Cowan*, 227 F.3d 893, 901 (7th Cir. 2000) (citing *Wainwright,* 455 U.S. at 587-88). Thus, because Petitioner had no constitutional right to counsel during direct appeals, appellate counsel's failure to raise Claim 1 in a discretionary PLA to the Illinois Supreme Court during direct appeals cannot constitute "cause" to excuse Petitioner's default. Second, Petitioner has not shown that procedurally barring the

habeas petition would result in a "miscarriage of justice" because he has not presented any new and reliable evidence to cast doubt on his guilt, as required by *Schlup* and *Hayes*.

Thus, because Petitioner failed to pursue Claim 1 on direct appeal in a PLA to the Illinois Supreme Court and does not satisfy either of the two exceptions to procedural default, Claim 1 is procedurally defaulted, and this court will not reach the merits of this claim.

## CLAIMS 2, 3, and 4—INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner claims that his trial counsel and appellate counsel were ineffective at points in trial proceedings and direct appeal. Similar to Claim 1, Claim 2 is procedurally barred for Petitioner's failure to raise it in one complete round of state-court review. Claims 3 and 4 were reasonably rejected by the state appellate court on the merits because these claims do not meet the standard for ineffective assistance of counsel set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### A. CLAIM 2—trial counsel ineffective for failing to elicit testimony from Cintron that she lied to the grand jury and at trial

Petitioner claims that his trial counsel was ineffective for failing to sufficiently cross-examine witness Rosie Cintron and to secure from her an admission that she lied to the grand jury and at trial. Petitioner raised this claim on direct appeal in his pro se supplemental brief, but he did not file a PLA with the Illinois Supreme Court following the appellate court's ruling to affirm his conviction. Therefore, similar to Claim 1, Claim 2 is procedurally defaulted for Petitioner's failure to raise it in one complete round of state court review. *See Lewis*, 390 F.3d at 1026.

Furthermore, Petitioner does not meet either of the two exceptions to procedural default because he failed to show (1) "cause for and prejudice stemming from that default" or (2) that the failure to consider the claim will result in a "miscarriage of justice." *Lewis*, 390 F.3d at 1026.

As discussed above in Claim 1, Petitioner's claim that direct appeal counsel was ineffective for failing to raise this claim cannot constitute "cause" to excuse procedural default because Petitioner had no federal constitutional right to counsel during discretionary appeals. *See Anderson v. Cowan*, 227 F.3d at 901.

Thus, because Petitioner failed to pursue Claim 2 on direct appeal in a PLA to the Illinois Supreme Court and does not satisfy either of the two exceptions to procedural default, Claim 2 is procedurally defaulted, and this court will not reach it on the merits.

## B. CLAIM 3—direct appeal counsel ineffective for failing to raise Claims (1) and (2) on direct appeal

Petitioner claims that his direct appeal counsel was ineffective for failing to raise two claims: (a) that the State violated Petitioner's due process rights by knowingly using perjured testimony of Rosie Cintron, who lied to the grand jury and at trial, and (b) that his trial counsel was ineffective for failing to elicit testimony from Cintron that she lied to the grand jury and at trial. However, I find that this claim is meritless and was reasonably rejected by the state appellate court in post-conviction appeal.

To evaluate this claim, I must look to the substantive standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) through the lens supplied by AEDPA. To prevail on an ineffective assistance claim, *Strickland* requires that a Defendant demonstrate that (1) counsel's performance fell "outside the wide range of professionally competent assistance and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Sussman v. Jenkins,* 636 F.3d 329, 349 (7th Cir.2011) (quoting *Allen v. Chandler,* 555 F.3d 596, 600 (7th Cir.2009) (quoting *Strickland,* 466 U.S. at 690, 694)). The standard for judging this rule alone is "a most deferential one" and therefore [s]urmounting *Strickland'*s high bar is never an easy

task." *Harrington v. Richter*, ——U.S. ——, ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011). Prevailing on a habeas claim for ineffective assistance in the present circumstance is "all the more difficult" because I must apply AEDPA's "highly deferential" standard to the *Strickland* standard which is, itself, highly deferential. *See id.* Petitioner's claim is limited to an assertion that the state court's ruling was an unreasonable application of clearly established Federal law. *See* 28 U.S.C. § 2254(d)(1). Thus, in the context of a federal habeas petition governed by AEDPA, the petitioner must demonstrate that the state court "applied *Strickland* to his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 687, 122 S.Ct. 1843, 1846, 152 L.Ed.2d 914 (2002).

### a. Direct appeal counsel's failure to raise the State's violation of Petitioner's due process rights

First, the Illinois Appellate Court reasonably rejected Petitioner's claim that direct appeal counsel was ineffective for failing to raise the issue of whether Petitioner's due process rights were violated by the State's knowing use of false testimony. As an initial matter, the state appellate court found that the due process claim itself was meritless because no evidence suggested that the prosecution knew prior to cross-examination that any of Cintron's testimony was false. *People v. Garcia*, 405 Ill. App. 3d 608, 623, 939 N.E.2d 972, 986 (2010). Thus, under *Strickland*'s first prong, direct appeal counsel's failure to raise the meritless due process issue did not mean its performance fell outside the wide range of competent assistance because, as the appellate court noted, appellate counsel was not required "to raise every imaginable issue." *Id.* *See also Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986) ("process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy").

Even if we assume appellate counsel's performance was incompetent, Petitioner did not show under *Strickland's* second prong that the outcome of the appeal would have been different without Cintron's testimony. Petitioner's own written statement was more powerful evidence, as Cintron's testimony only related to events before and after the offense and did not place petitioner at the scene. *Garcia*, 939 N.E.2d at 986.

### b. Direct appeal counsel's failure to raise trial counsel's ineffectiveness

Petitioner's next claim that direct appeal counsel was ineffective for not raising the issue of trial counsel's ineffectiveness with respect to Cintron's testimony fails on *Strickland's* second prong, and the state appellate court reasonably rejected this claim. Petitioner could not assert that the outcome of the direct appeal would have been different but for appellate counsel's omission because the appellate court allowed Petitioner to raise the issue of trial counsel's ineffectiveness in his own pro se supplemental brief and then adjudicated the claim on the merits. *See Garcia*, 939 N.E.2d at 985-86.

Furthermore, there was no reasonable likelihood that the outcome of the direct appeal would have been different even if counsel had raised the issue, since the issue itself was non-meritorious. *See id.* (reasoning that since Petitioner's claim is "necessarily premised on allegations of trial counsel's ineffectiveness . . . where the underlying claim is nonmeritorious, defendant cannot demonstrate prejudice"). The appellate court maintained that trial counsel was not ineffective because trial counsel's cross-examination of Cintron was "more than adequate under the circumstances," given that Cintron maintained Petitioner confessed to her, and petitioner's written statement was more damaging. Therefore, had counsel raised that issue, there was no reasonable likelihood that the outcome of the direct appeal would have been different. *Id.* at 985.

Thus, because the state appellate court reasonably applied *Strickland* in its rejection of Petitioner's claim that appellate counsel was ineffective, Claim 3 is therefore denied on the merits.

### C. CLAIM 4—trial counsel ineffective for stipulating to the forensic evidence, which could have proved petitioner's innocence

Finally, Petitioner claims that his trial counsel was ineffective for stipulating to forensic evidence that there were no fingerprints found at the crime scene suitable for comparison and that there was no evidence of sexual assault (but samples taken on Sacramento and from the ledge under the viaduct contained human blood). The Illinois Appellate Court reasonably applied both prongs of *Strickland* in its rejection of this claim on post-conviction appeal. Applying *Strickland*'s first prong, the state appellate court reasonably concluded that trial counsel's actions with respect to the stipulations were a reasonable strategic decision:

> [Petitioner's] defense to the fatal beating of Anderson was, essentially, "I was not there, I did not do this." This position seemingly negates the necessity of testing the evidence collected. The results the parties stipulated to were inconclusive. Therefore, they were neutral to [Petitioner's] case. Further testing could serve to provide additional inconclusive results or, even worse, undermine the defense by potentially implicating [Petitioner]. The latter option is patently problematic. Leaving the forensic evidence as—at worst—a neutral factor, trial counsel made a reasonable strategic decision. Likewise, the decision to stipulate to Fish's testimony, as well as that of the fingerprint analyst, was also a reasonable strategic decision. We fail to discern that trial counsel's performance was deficient in this regard.

*Garcia*, 939 N.E.2d at 982-83. Applying *Strickland*'s second prong, the appellate court also reasonably concluded that because Petitioner's testimony at trial and his confession implied that he had no physical contact with the victim, any determination that Petitioner's bodily fluids were not present at the scene would not have exculpated him:

> Even were we to conclude counsel's performance was
> constitutionally deficient, we would not find any prejudice inured
> to [Petitioner]. As noted, the forensic evidence adduced at trial did
> not inculpate [Petitioner] or otherwise impair his defense.
> Therefore, we fail to perceive how additional testing or refusing to
> stipulate to the Fish's testimony would have advanced
> [Petitioner's] defense. We, therefore, conclude [Petitioner's] claim
> of ineffective assistance of trial counsel is without merit.

*Id. See also Harrington*, 131 S.Ct. at 788-89 (rejecting an ineffective assistance claim because

counsel made reasonable decision not to pursue forensic blood evidence, even when, in

hindsight, such evidence was potentially important). In other words, the prosecution did not rely

on forensic evidence to link Petitioner to the crime, and the lack of bodily fluids at the scene

would have been entirely consistent with both Petitioner's inculpatory statement and the

prosecution's theory of the case and would not have cast doubt on Petitioner's role in the crime.

Because the state appellate court reasonably applied *Strickland*, Petitioner's ineffectiveness of

trial counsel claim must fail.

## IV. CERTIFICATE OF APPEALABILITY

Under the 2009 amendments to the Rules governing § 2254 proceedings "the district

court must issue or deny a certificate of appealability ("COA") when it enters a final judgment

adverse to the applicant" for a writ of habeas corpus.

Section 2253(c) permits issuance of a COA only where petitioner has made a "substantial

showing of the denial of a constitutional right." *See id; see also Miller-El v. Cockrell,* 537 U.S.

322 at 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Additionally, when the federal district court

denies a habeas petition on procedural grounds without reaching the merits of the petitioner's

constitutional claims, a COA may be granted only if Petitioner demonstrates that "reasonable

jurists could debate whether (or, for that matter, agree that) the petition should have been

resolved in a different manner or that the issues presented were adequate to deserve

encouragement to proceed further." *Id.; Slack v. McDaniel,* 529 U.S. 473, 475, 120 S.Ct. 1595, 1599, 146 L.Ed.2d 542 (2000).

I find that all four of Petitioner's claims do not meet this standard because they are either procedurally defaulted or meritless, and Petitioner has failed to show a debatable claim of a denial of a constitutional right. Therefore, I decline to grant a COA as to these claims.

## V. CONCLUSION

For the reasons above, Petitioner's request for a writ of habeas corpus must be DENIED, and he has not earned a certificate of appealability for any of his claims.

ENTER:

James B. Zagel
United States District Judge

DATE: August 14, 2012